COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Moon, Judges Coleman and Overton
Argued at Salem, Virginia


HUDGINS MASONRY, INC. AND
 ROCKWOOD INSURANCE COMPANY
                                       MEMORANDUM OPINION[*] BY
v.        Record No. 1515-96-3      CHIEF JUDGE NORMAN K. MOON
                                          FEBRUARY 25, 1997
RONALD ANDERSON HANDY


            FROM THE VIRGINIA WORKERS' COMPENSATION COMMISSION

            S. Vernon Priddy, III (Mark M. Caldwell, III;
            Sands, Anderson, Marks & Miller, on brief),
            for appellants.

            Bettina C. Altizer (Jack V. Altizer; Altizer &
            Altizer, on brief), for appellee.


     Hudgins Masonry, Inc. ("Hudgins") appeals the decision of

the commission awarding Ronald Anderson Handy permanent total

disability benefits.  Hudgins raises two questions: (1) whether

the commission misapplied the two-prong test for determining a

claimant's "imbecility" under former Code § 65.1-56(18); and (2)

whether the commission erred in finding that Handy had

established his entitlement to permanent and total disability

benefits under the two-pronged test for determining a claimant's

"imbecility" under former Code § 65.1-56(18).  Holding that the

commission properly applied the two-pronged test for determining

"imbecility" and that the evidence was sufficient to support the

finding that Handy's brain injury rendered him unemployable and

        [*]Pursuant to Code § 17-116.010 this opinion is not
designated for publication.

affected the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes, we affirm.

On May 23, 1984, while working for Hudgins, Handy, then age twenty-one, fell off a scaffold approximately forty feet in the air. He was rushed to a hospital emergency room where it was determined that he suffered from massive head and brain injuries and fractures of the left arm and pelvis. MRIs and x-rays revealed that bone fragments had been driven as much as five to six centimeters into the left parietal area of Handy's brain. Handy's condition required extensive surgery and prolonged hospitalization. On July 25, 1984, Handy was determined, "by reason of physical injury . . . to be wholly incapable of taking care of himself and his estate, [and] is incapacitated and wholly legally disabled." Accordingly, Handy's mother, Debeter L. Price, was appointed Handy's guardian. On October 28, 1984, Handy was discharged to the full-time care of his mother with continuing care by rehabilitation, orthopaedic, and neurological specialists.

On April 11, 1994, Handy was seen by Dr. Joel C. Morgenlander, a neurologist and assistant professor of medicine at Duke University Medical Center. On July 15, 1994, Morgenlander wrote Handy's counsel, informing him that "[i]t is my opinion as a Board Certified Neurologist that Mr. Handy is very likely to be permanently unemployable because of his neurologic deficits. It has been ten years since his accident

and I don't expect significant further improvement to occur. Mr. Handy has cognitive, visual and motor deficits that are quite severe."

Handy's claim for compensation was approved, and Handy was paid temporary total disability from the date of the accident until January, 1994. On May 17, 1994, Handy filed a claim requesting the Virginia Workers' Compensation Commission award him permanent total disability benefits. On November 14, 1994, a deputy commissioner awarded Handy permanent total disability benefits. The award of permanent full benefits was affirmed by the full commission on April 10, 1995.

Hudgins appealed to this Court and after hearing the matter, on February 20, 1996, we entered an order reversing the commission's decision and remanding the case to the commission for a "reconsideration of the record presently before it in light of a correct application of the term 'imbecility'" pursuant to Barnett v. D.L. Bromwell, Inc., 6 Va. App. 30, 366 S.E.2d 271 (1988). On May 20, 1996, the commission issued its second opinion, reaffirming its prior opinion of April 10, 1995, and finding that Handy was entitled to an award of "permanent total disability pursuant to the criteria set forth in the Court of Appeal's Remand Order of February 20, 1996."

The determination of "imbecility" within the meaning of former Code § 65.1-56(18) involves a two pronged test: (1) the brain injury must render the claimant permanently unemployable; and (2) it must affect the non-vocational quality of his life by

eliminating his ability to engage in a range of usual cognitive processes.  Barnett, 6 Va. App. at 36, 366 S.E.2d at 274.  In Barnett we concluded that a brain injury which had this effect was "the functional equivalent, and meets the intended statutory definition, of incurable imbecility contemplated by [former] Code § 65.1-56(18)."  Id.

Dr. Morgenlander examined Handy ten years after Handy's accident and reported that Handy "could name objects but had difficulty with their parts.  He could remember 6 of 6 objects at zero minutes but only 2 of 6 after 3 minutes even with hints.  He could follow simple commands but had difficulty repeating no if ands or buts."  Dr. Morgenlander also found that Handy's

> neurologic examination demonstrates a spastic right hemiparesis with right homonomous hemianopsia, decreased sensation of the right side of his body and mild expressive type aphasia.  Additionally, he suffers from headaches and seizures. . . . Due to his significant cognitive, visual and motor disabilities I don't believe he will be able to return to work.

In his letter of July 15, 1994, Dr. Morgenlander concluded that: "Mr. Handy is very likely to be permanently unemployable because of his neurological deficits.  It has been ten years since his accident and I don't expect significant further improvement to occur.  Mr. Handy has cognitive, visual and motor deficits that are quite severe."

The fact that the commission also reviewed evidence regarding Handy's non-neurological injuries, e.g., the damage to his left elbow and pelvis, does not render the commission's

- 4 -

finding in error. The commission was careful to indicate that it was Handy's brain injury, not his other injuries, which resulted in both his unemployable status and the impairment of his usual cognitive processes. The commission specifically stated that Handy's brain "injury resulted in impairments which, <u>independent of the other non-related physical injuries</u>, would render [Handy] totally disabled." (Emphasis added). In addition, the commission explained that:

> The brain injury resulted in the loss of use of the right leg, intermittent seizures, and limited short-term memory. The medical evidence does not specifically separate the effects of these injuries on [Handy's] employability, as pointed out by counsel for the employer, but we find that they effectively render him unemployable. <u>This would be the case regardless of the injury to his left arm and his altered gait which may be the result of the physical injury to his pelvis</u>.

(Emphasis added).

The record also indicates that the commission properly reviewed the evidence as it related to prong two of the <u>Barnett</u> test, concerning the impairment of Handy's non-vocational quality of life. The evidence presented by Handy's physicians was sufficient to sustain the commission's finding that Handy's brain injury affected the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes.

Both Drs. Morgenlander and Coonrad, an orthopaedic surgeon at Durham-Chapel Hill who examined Handy, provided evidence of

Handy's cognitive deficiencies resulting from his brain injury. Dr. Morgenlander's determination that Handy could not remember two of six objects after three minutes and could not follow conditioned commands is evidence of both Handy's unemployable status and impairment of usual cognitive processes that impacted his non-vocational and vocational life. In his letter of January 4, 1995, Dr. Morgenlander concluded that:

> I believe Mr. Handy suffered an irreversible brain injury rendering him permanently unemployable and affecting the nonvocational quality of his life due to his cognitive, visual, and motor deficits. While I did say in my conclusion that Mr. Handy's aphasia was mild, that by no means denotes a language problem that does not interfere with Mr. Handy's interactive life. While he could name objects, he could not name parts of objects and could not repeat normally. His memory was diminished. . . . [He has] severe visual deficit due to his field cut and his severe hemiparesis and hemisensory loss.

Similarly, Dr. Coonrad concluded that Handy's brain injury had resulted in debilitating cognitive changes resulting in his inability to work or to independently care for himself. Again, the commission's review of evidence of the non-brain injuries sustained by Handy does not render the finding void. The commission's findings clearly indicate that it was careful to differentiate between the effects of Handy's brain and non-brain injuries, as is evidenced by the commission's finding that:

> Handy's short-term memory is severely limited. . . . He apparently is able to follow only simple commands. Although [Handy] can read, this ability must be considered in light of his limited short term memory. Dr. Coonrad notes that [Handy] is not able to handle his own affairs, nor care

for himself on a daily basis without his
family's assistance.

Holding that the commission properly applied the Barnett test and that the evidence was sufficient to support the finding that Handy's brain injury rendered him unemployable and affected the non-vocational quality of his life by eliminating his ability to engage in a range of usual cognitive processes, we affirm.

Affirmed.